Keith A. Call (#6708)
Dennis V. Dahle (#5938)
**SNOW, CHRISTENSEN & MARTINEAU**
10 Exchange Place, Suite 1100
Salt Lake City, Utah 84111
Telephone (801) 521-9000
Facsimile (801) 363-0400
*kcall@scmlaw.com*
*dvd@scmlaw.com*

*Attorneys for Plaintiffs*

---

# IN THE UNITED STATES DISTRICT COURT

# DISTRICT OF UTAH

| | |
|---|---|
| PATRICIA TANNER, an individual;  and TJINTA ESTATES, LLC, a Utah limited liability company, | |
| Plaintiffs, | **COMPLAINT AND JURY DEMAND** |
| vs. | |
| HEATH JOHNSTON, an individual; CRAIG LEWIS, an individual; TIMOTHY ROSS, an individual; H & S INVESTMENTS, LLC, a Utah limited liability company d/b/a SUMMIT DEVELOPMENT & MANAGEMENT; JUSTIN JOHNSTON, an individual; and AMERICAN COMMERCIAL REAL ESTATE SPECIALISTS GROUP, LLC, a Utah limited liability company d/b/a NAI UTAH COMMERCIAL REAL ESTATE, | Civil No. _____<br><br>Judge _____ |
| Defendants. | |

Plaintiffs Patricia Tanner ("Ms. Tanner") and Tjinta Estates, LLC allege as follows:

## INTRODUCTION

1.      Plaintiffs bring this action against defendants Heath Johnston, Craig Lewis, Timothy Ross, H & S Investments, LLC, d/b/a/ Summit Development & Management ("Summit"), Justin Johnston, and American Commercial Real Estate Specialists Group, LLC, d/b/a NAI Utah Commercial Real Estate, for common law fraud, breach of contract, civil conspiracy, securities fraud and other claims in connection with the sale of securities and other property to Ms. Tanner, an elderly, unsophisticated investor.

2.      In the summer of 2006, Heath Johnston, a founder and manager of Summit, approached Ms. Tanner about making an investment in Summit using the proceeds from a contemplated sale of five properties from Ms. Tanner to Summit.   Heath Johnston and Craig Lewis, another principal at Summit, pitched Ms. Tanner on the investment, in person and in writing, making false and deceptive statements and omissions in connection with their offer. Johnston and Lewis offered Ms. Tanner a Promissory Note and assured her that her $600,000.00 investment was safe, using various artifices such as a personal guarantee of payment, glossy brochures, a stack of pre-made checks for the interest payments on the Note, and conveyance of paper title on two "lots" in a large real estate development project in Hurricane, Utah.   Among other things, Johnston, Lewis and their associates and agents concealed from Ms. Tanner the existence of a $15,000,000.00 lien on the Hurricane property, and concealed the fact that the "lots" were not yet approved for subdivision.  Summit, Johnston and Lewis failed to disclose to Ms. Tanner any risk associated with her investment.

3.      Johnston and Lewis then fraudulently induced Ms. Tanner to surrender any remaining collateral value her "lots" had by inducing her to sign three deeds of trust placing

2

additional liens of more than $9,000,000.00 on the Hurricane property, extinguishing any remaining collateral value the two "lots" might have had for Ms. Tanner.

4.     Johnston and Summit failed to return Ms. Tanner's investment as promised. Johnston and Summit concealed their financial troubles from Ms. Tanner as long as they could, and when those financial troubles began to come to light Johnston used the religious affinity he purportedly shared with Ms. Tanner to persuade her not to pursue legal remedies.  Johnston also sought to extinguish his legal liability by inducing Ms. Tanner to roll her investment into another Summit project, though doing so would have operated as a fraud on Ms. Tanner and other investors of Summit/Johnston.

5.     By virtue of the conduct described in this Complaint, Summit, Johnston and Lewis, directly and indirectly, engaged in acts, practices, and courses of business that constitute fraud, breaches of contract, conspiracy, deceptive and unfair business practices, securities fraud, and other claims asserted in this Complaint.

**PARTIES, JURISDICTION AND VENUE**

6.     Patricia Tanner ("Ms. Tanner") is an individual who resides in Utah County, Utah.  She is a 77 year-old grandmother, retiree, cancer patient and financially unsophisticated person.

7.     Tjinta Estates, LLC is a Utah limited liability company.  Ms. Tanner is a member and manager of Tjinta Estates.  Tjinta Estates is an entity in which Ms. Tanner holds (or held) the bulk of her financial assets.  These assets represented the accumulation of a lifetime of hard work, saving, and careful management, together with an inheritance Ms. Tanner received from

her parents.  Ms Tanner operates and manages Tjinta Estates from her home in Utah County, Utah.

8.      H & S Investments, LLC is a limited liability company founded and controlled by Heath Johnston.  Its principal place of business is Utah County, Utah.  H & S Investments does business using the name Summit Development and Management.  H & S Investments, LLC and its d/b/a Summit Development and Management are referred to in this Complaint as "Summit."

9.      Heath Johnston ("Johnston") is a real estate developer and a founder, principal and manager of Summit.  Johnston resides in Utah County, Utah.

10.     Craig Lewis ("Lewis") is a certified public accountant and was listed as a Summit "Principal" on a Summit marketing document provided to Ms. Tanner at the time she contemplated making her investment.  In an on-line networking site, Lewis states that he is the "Operations Partner" in Summit, "managed all aspects of Finance and Operations" for Summit, and was "successful in packaging and raising investment funds over $25M and development loans over $100M" for Summit.  Lewis resides in Utah County, Utah.

11.     Timothy Ross ("Ross") was listed as a Summit "Principal" on Summit promotional materials provided to Ms. Tanner at the time of her investment.  Upon information and belief Ross was Johnston's principal partner in the Hurricane project; together with Johnston and Lewis, Ross raised millions of dollars from investors for the Hurricane project.  On information and belief, Ross resides in Utah County, Utah.

12.     At all relevant times, Johnston, Lewis and Ross acted as agents and employees of Summit.  Summit is therefore vicariously liable for all of the acts of Johnston, Lewis and Ross.

4

13.     Justin Johnston ("Justin Johnston") is licensed in Utah as an associate real estate broker and was involved in a sham transfer of two "lots" located in Hurricane, Utah to Ms. Tanner.  Justin Johnson was employed at the time by NAI Utah Commercial Real Estate.  On information and belief, Justin Johnston resides in Utah County, Utah.

14.     American Commercial Real Estate Specialists Group, LLC ("ACRES"), is a Utah limited liability company that does business under various trade names, including NAI Utah Commercial Real Estate, NAI Utah Commercial Real Estate Services, and NAI Utah Commercial, Inc.  On information and belief, ACRES employed Justin Johnston at all relevant times.  Justin Johnson's acts and omissions as described in this Complaint were within the scope of his employment, making ACRES vicariously liable for Justin Johnston's acts and omissions. ACRES maintains offices in Salt Lake County and Utah County, Utah.

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because one or more of the claims asserted below arises under the laws of the United States.  This Court has subject matter jurisdiction of the remaining claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims in this action that they form part of the same case or controversy.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because one or more of the defendants reside in this judicial district and because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## GENERAL ALLEGATIONS

I.    **Defendants Prey on a Vulnerable Investor**

17.    In or around the Summer and Fall of 2005 Heath Johnston was attempting to raise money to finance a large real estate development project in Hurricane, Utah (the "Hurricane Project").

18.    As of the Fall of 2005, the Hurricane Project was undercapitalized.

19.    As of the Fall of 2005, Ms. Tanner owned six low-income residential rental properties in Utah County, Utah.  Five of these properties were located on or near 4800 North in Provo, Utah.  The 4800 North properties were part of a condominium owners association.

20.    The six rental properties owned by Ms. Tanner constituted the bulk of Ms. Tanner's financial assets.  Those rental properties provided a relatively comfortable and secure stream of income for Ms. Tanner.

21.    In 2005, the various owners of the condominium association at 4800 North decided to sell their condominiums.  A commercial real estate broker, Justin Johnston ("Justin Johnston," not to be confused with Johnston), introduced the association to his brother, Johnston, a developer interested in buying all of the 4800 North condominium properties.  Johnston met with the condominium owners (including Ms. Tanner) over the next several weeks.  Johnston eventually agreed to pay $150,000.00 for each property.

22.    Johnston eventually paid the $150,000.00 purchase price to each owner of each unit in the condominium association except for Ms. Tanner.

23.    Sometime in the Summer of 2006, after one of the meetings with the condominium owners regarding Johnston's proposed purchases, Johnston separately approached

Ms. Tanner.   At the time Summit was under contract with Ms. Tanner to purchase her five condominium units for $750,000.00.   Johnston asked Ms. Tanner what she planned to do with all of that money.

24.   Ms. Tanner informed Johnston that she planned to reinvest her sale proceeds in real estate in order to generate income for her retirement while avoiding capital gains tax. Johnston then suggested to Ms. Tanner that, rather than invest in and continue to manage residential properties herself, she should invest with him.  Johnston told Ms. Tanner he could and would pay her a very attractive rate of return of 15%—higher than she could get from other real estate investments.   Johnston explained that Summit had two development projects in the works—one in Saratoga Springs, the other in Hurricane, Utah.   Johnston told Ms. Tanner she could take her pick of the project in which she wanted to invest.   He then suggested she come by his office to discuss it further.

25.   Shortly thereafter, Johnston gave Ms. Tanner glossy brochures promoting the Summit projects in Saratoga Springs and Hurricane.   Ms. Tanner told Johnston the Hurricane development sounded interesting.   The brochures touted the contemplated features and amenities of each Summit development, but failed to disclose any of the risks associated with investing in Summit.  Ms. Tanner relied on the statements and omissions in these brochures in making her investment decisions.

26.   A short time later, also during the Summer of 2006, Ms. Tanner went to the Orem offices of Summit and met with Johnston and another Summit principal, Craig Lewis.  Johnston and Lewis both pitched Ms. Tanner on investing in Summit, promising her a 15% rate of return. Johnston and Lewis knew that by promising outsized returns, they could lure investors like Ms.

Tanner away from investments that were far safer and far more appropriate for someone of Ms. Tanner's age and financial position.

27.     The two men enthusiastically described the Hurricane project, which was to feature high-end lots, a designer golf course, and bicycle paths.  Ms. Tanner reiterated that for tax reasons she wanted to do a 1031 Exchange.  Johnston replied that he thought he could arrange it so that she could invest in Summit and have it qualify as a 1031 Exchange.  Johnston told her he would arrange everything and to leave the details to him.

28.     At the time Johnston and Lewis made these representations to Ms. Tanner, they knew or should have known that the Hurricane Project was undercapitalized.  They knew or should have known that neither Summit nor its principals had the means to pay 15% on Ms. Tanner's contemplated investment of between $600,000.00 and $750,000.00 in the event the Hurricane Project should encounter any difficulties.  They knew or should have known that failure of the Hurricane Project could mean the loss of Ms. Tanner's entire investment.  And yet neither Johnston, Lewis, nor anyone else at Summit ever disclosed to Ms. Tanner during this meeting, or at any time before or after this meeting, orally or in writing, any of these or other numerous and serious risks associated with Ms. Tanner's investment.  Instead, Johnston and Lewis assured Ms. Tanner that her investment would be safe.

29.     Ms. Tanner relied on the false and misleading statements and omissions of Johnston and Lewis at the summer 2006 meeting in making her investment decisions.

## II.     The "Investment Opportunity" Memorandum

30.     Shortly after the meeting at Summit's Orem offices involving Ms. Tanner, Johnston and Lewis, Johnston and Lewis sent Ms. Tanner a memorandum with seven bullet

points summarizing the "investment opportunity" they had worked out for her.   A true and correct copy of this memorandum is attached as Exhibit 1.   The memorandum was false and misleading in several material respects, including the following:

      a.    The first bullet point states that Ms. Tanner would be investing "into a number of lots in the Mira Rosa Subdivision of the Collina Tinta Golf Course Community project in Hurricane, Utah, being developed by Summit Development, with an equal value to your investment."   In fact, as Johnston and Lewis knew or should have known, the lots, both in terms of their number (two) and their status (unimproved, lacking even the necessary approvals for development, and subject to a $15,000,000.00 undisclosed lien) did not have value equal to or even remotely approaching the value of Ms. Tanner's proposed investment.

      b.    The second bullet point states that Ms. Tanner would be the "owner of said lots and be recorded as such."   In fact, as Johnston and Lewis knew or should have known, Summit would only be transferring paper title to Ms. Tanner; her "ownership" of the lots would be an illusory sham.

      c.    The third bullet point states that Ms. Tanner "will need to subordinate to construction financing for the improvement of these lots, which only increases the collateral value of the lots."   As Johnston and Lewis knew or should have known, Ms. Tanner—a senior citizen with no background or experience in commercial real estate development and financing—had no understanding of what the terms "subordinate" or "construction financing" even meant, and they falsely reassured her that subordinating her ownership interest would only "increase[ ] the collateral value of the lots," when in

fact subordinating her ownership interest would have just the opposite effect, extinguishing any possible collateral value the lots might have for Ms. Tanner.

      d.    The fourth bullet point states that Ms. Tanner "will receive a guaranteed Fifteen Percent (15%) Annual return on your money over a 12 to 16-month period."  In fact, Johnston and Lewis knew or should have known this "guaranteed" return was far in excess of the market rate of return, and far beyond Summit's or its principals' ability to pay, other than by making the interest payments out of Ms. Tanner's own principal.

      e.    The sixth bullet point states that Ms. Tanner's "investment will be guaranteed by Summit Development & Management, LLC and by Heath Johnston (owner) personally."  As Johnston and Lewis knew or should have known, this was an empty promise, given that neither Johnston nor Summit stood in any position to give such guarantees to Ms. Tanner, having already given millions of dollars of guarantees to banks and other investors far in excess of their ability to pay, and lacking income or assets that might support any such guarantees to Ms. Tanner.

      f.    The memorandum fails to disclose or discuss any risk associated with the contemplated investment, notwithstanding the fact that Johnston and Lewis both knew or should have known that any investment Ms. Tanner might make with Summit would be subject to enormous risk.

31.    Johnston and Lewis knew or should have known that the statements and omissions in the memorandum were false and misleading at the time they mailed the memorandum to Ms. Tanner.  Ms. Tanner relied on the false and misleading statements and omissions in the memorandum in making her investment decisions.

**III.**   **The Investment**

32.     Based on and in reliance on the information provided to her by Summit, Johnston and Lewis, Ms. Tanner accepted an investment opportunity that Summit, Johnston and Lewis offered to her.  The investment, as designed and orchestrated by Summit, Johnston and Lewis was as follows: in return for a $600,000.00 investment from Ms. Tanner, Summit gave Ms. Tanner a "Promissory Note," personally guaranteed by Johnston, promising to re-pay Ms. Tanner the principal amount of her investment plus 15% interest, with a 12-18 month term.  A true and correct copy of this Promissory Note is attached as Exhibit 2.

33.     At the time they guaranteed the Promissory Note, Summit, Johnston and their associates knew or should have known, but did not disclose to Ms. Tanner, that the guarantees were essentially worthless and that neither Summit nor Johnston stood in any position to guarantee repayment, having already issued guarantees on other investments far in excess of their ability to pay.

34.      To provide further reassurance that Summit would make the interest payments on the Promissory Note, Johnston and Lewis gave Ms. Tanner a stack of twelve already made-out, pre-dated checks and told her she could simply take a check to the bank each month and cash it. These checks, drawn on a Summit bank account controlled by Johnston and Lewis, provided no real assurance of payment, as Johnston and Lewis knew or should have known, but Ms. Tanner felt reassured by having a stack of pre-dated checks just as Johnston and Lewis had calculated.

35.     Johnston and Lewis further deceived Ms. Tanner into believing that her investment was safe, and that it would qualify as a 1031 tax-free exchange, by offering to transfer to Ms. Tanner title to two lots in the Hurricane Project.  Johnston and Lewis assigned a

11

value of $300,000.00 to each lot.  Johnston assured Ms. Tanner that this price was the going rate

for such lots.  Johnston described the lots as prime lots—the very best lots in the development—

so good in fact that he said he planned to build a house for his own family on one of the lots,

while another member of his family planned to build a house on the other lot.  Johnston told Ms.

Tanner she could hold title on these prime lots until the Promissory Note was repaid, at which

point she was to transfer title back to him.  Johnston told Ms. Tanner her money would then be

rolled into another Summit project, also tax-free.

36.     Based on Johnston's representations, Ms. Tanner felt reassured that her

investment was to be secured by title to two choice lots in the Hurricane Project—not just any

lots, but lots that Johnston wanted for himself and his family.  The key to this reassurance was an

enormous knowledge gap: Johnston intentionally misled Ms. Tanner to believe her title in the

two lots provided security on her investment, while in fact, as Summit, Johnston, Lewis and their

associates knew, this sham ownership interest provided no security whatsoever.  Ms. Tanner did

not understand, and Johnston, Lewis and their associates did not explain, that her ownership was

illusory, that she would not hold title to the lots free and clear, but rather her lots would be

subject to a $15,000,000.00 undisclosed lien on the larger development project, and that their

plan to have her "subordinate to construction financing" actually meant, contrary to their

representations, that the lots would have no collateral value to her.

37.     In a bizarre twist, Johnston and Lewis then arranged to "lease" the lots from Ms.

Tanner and entered into a "Lease Agreement," a true and correct copy of which is attached as

Exhibit 3.  This lease was part of a scheme to convince Ms. Tanner that the transaction would

qualify for tax deferral under IRS Code Section 1031.  Johnston assured Ms. Tanner she would

not be required to pay tax on the sale of her condominium properties.  The lease agreement gave Summit a purchase option, whereby Summit could require Ms. Tanner to reconvey title to the two lots back to Summit upon payment of $630,000.00.

38.     Ms. Tanner did not understand how this all worked but she trusted Johnston and Lewis.  In reliance on the information provided to her by Summit, Johnston and Lewis, and facing what she believed was a deadline to reinvest to save taxes, Ms. Tanner agreed to invest, and did in fact invest, $600,000.00 with Summit in or about September 2006.

**IV.     The Sham Title Transfer**

39.     On or about September 22, 2006, Summit, Johnston, Lewis and their associates and agents caused Ms. Tanner to enter into two "Real Estate Purchase Contracts" for the two "lots."  Tjinta Estates was listed as the buyer on these Real Estate Purchase Contracts.  Neither Summit, nor Summit's broker in the sale, ACRES, nor Summit's selling agent (Justin Johnston, brother of Heath Johnston), disclosed the identity of the seller in these purchase contracts, nor did they disclose the fact that Summit had previously placed a $15,000,000.00 lien on the property.

40.     On or about September 25, 2006, Johnston invited Ms. Tanner to the offices of a title company for a real estate "closing" on the two lots.  Ms. Tanner was unrepresented by counsel at the "closing," just as she was unrepresented by counsel throughout all her dealings with Johnston, Lewis and Summit.  Johnston, Lewis and their associates and agents exploited this fact, just as they had always exploited her age and lack of financial sophistication.  Ms. Tanner did not understand, and Johnston, Lewis and their associates and agents did not explain the contents of the closing documents.  They simply told Ms. Tanner the documents were all

necessary to her investment and asked her to sign.  Ms. Tanner did as she was told, signing the documents that Johnston, Lewis and their associates and agents put before her.

41.     After the closing Johnston, Lewis and their associates and agents continued to conceal the existence of the $15 million lien from Ms. Tanner.  Title policies and deeds mailed to Ms. Tanner on or about December 9, 2006 did not disclose the lien on the lots.

42.     Furthermore, based on notices subsequently issued by Washington County, it appears that the subdivision of the two lots from the larger parcel had not even been approved.

43.     After the "closing" Summit, Johnston and Lewis used the instrumentalities of interstate commerce, both mail and fax, to deliver to Ms. Tanner her copies of the Promissory Note, the Lease Agreement, and the real estate purchase contracts for the two "lots."

**V.     Failure to Disclose Risks**

44.     At no time did Summit, Johnston, Lewis or any of their associates so much as mention, much less explain, any risks associated with the Investment.  The "1031 Investment Opportunity" memo is devoid of any disclosure of risk, as were the glossy brochures given to Ms. Tanner.  Instead, Summit, Johnston, Lewis and their associates purposefully concealed the enormous risks of the investment while employing various schemes and artifices to mislead Ms. Tanner into believing her investment was safe.

**VI.    Management of the Hurricane Project/Access to Information**

45.     Management of the Hurricane Project was entirely the responsibility of Johnston, Lewis and their associates.  At no point did any of the parties contemplate that Ms. Tanner would take an active role in the management of Summit or the Hurricane Project.

46.    At no point did Ms. Tanner have access to any information about Summit or the Hurricane Project beyond the explanations offered by Johnston, Lewis and their associates.  She knew from the brochures and the descriptions of Johnston and Lewis that it was to include a designer golf course and bicycle paths.  But beyond that, she had little information about the project, had no way of finding out more information, and lacked the expertise to evaluate such information had she been able to obtain it.

47.    In October, 2006 Johnston had his assistant email Ms. Tanner the exact location of the Hurricane Project and invite her to visit the construction site.  Ms. Tanner drove the four hours to southern Utah to visit the site of the Hurricane Project and was escorted around the property by Johnston's and Summit's representative in St. George, Cameron England.  During that visit, in October 2010, England pointed out a piece of land near a retaining wall and told Ms. Tanner, "That's where your two lots will be." Ms. Tanner felt reassured by the statement of Johnston's and Summit's representative, which served to further deceive Ms. Tanner into believing her ownership interest was real, that her "lots" provided security for her investment, when in fact her interest was illusory and a complete sham.

## VII.    Johnston and Ross Induce Ms. Tanner to Sign Three Separate Deeds of Trust, Placing Additional Liens of over $9,000,000.00 on Her Property

48.    On or about November 29, 2006, Johnston again summoned Ms. Tanner to the offices of a title company, telling her he had "a few documents" he needed her to sign in connection with her investment.

49.    With false and misleading statements and omissions, Johnston, Lewis and their associates and agents induced Ms. Tanner to sign two separate "Real Estate Deeds of Trust" in favor of ANB Financial, in the amounts of $4,000,000.00 and $2,850,000.00.

50.     Another investor in the scheme (Lynn Lloyd Armistead, a former neighbor of Ms. Tanner) also signed these Real Estate Deeds of Trust, as did Johnston and Timothy Ross, another principal at Summit.

51.     Unbeknownst to Ms. Tanner, the "few documents" Johnston and Lewis and their associates and agents induced Ms. Tanner to sign were in fact security instruments to provide security for additional debt on the already heavily-liened Hurricane Project.  None of Johnston, Lewis or their associates or agents explained anything about this to Ms. Tanner—they simply induced her to sign on behalf of Tjinta Estates.  For her part, all Ms. Tanner knew was that she trusted Johnston and his associates and they were presenting her with documents in connection with her investment and telling her she needed to sign, so she signed.

52.     Ms. Tanner was unrepresented by counsel at this signing, just as she was unrepresented by counsel throughout all her dealings with Johnston, Lewis and their associates. Johnston, Lewis and their associates and agents exploited this fact, just as they exploited her age and lack of financial sophistication throughout.  Even if Ms. Tanner had been given full opportunity to read the documents she signed on November 29, 2006, she lacked the ability to understand or appreciate their contents.

53.     Johnston told Ms. Tanner he would send her copies of the documents from the November 29, 2006 signing.  Sometime later Ms. Tanner received a package from Summit. Although she did not realize it at the time, these were an incomplete, partial set of the documents she had signed on November 29, 2006.  Whether by carelessness or design, the copies of each Real Estate Deed of Trust Summit sent to Ms. Tanner omitted the second page, wherein the fact and the amount of the loan secured were set forth.

16

54.     On or about August 28, 2007 Johnston and Lewis again duped Ms. Tanner into placing another lien on her "lots."  Ms. Tanner was again summoned to the offices of the title company and told she had to sign another document in connection with her investment.  As they had done before, Johnston, Lewis and their associates and agents induced Ms. Tanner, on behalf of Tjinta Estates, to sign yet another Real Estate Deed of Trust in favor of ANB Financial, this time in the amount of $2,380,000.00.   As before, the document was also signed by another investor in the scheme (Armistead) and by Johnston and Ross for Summit.

55.     Unbeknownst to Ms. Tanner, Johnston, Lewis and their associates and agents had now made Ms. Tanner's "interest" in the Hurricane "lots" subject to over $9 million in additional liens, over and above the $15 million undisclosed lien on the property that existed at the time of the sham title transfer in September 2006.  Neither Johnston, Lewis, nor any of their associates or agents explained any of this to Ms. Tanner—they simply induced her to sign yet another security instrument, making her ownership "interest" that much more illusory.  For her part, all Ms. Tanner knew was that she trusted Johnston and his associates and they were presenting her with documents in connection with her investment and telling her she needed to sign, so she signed.

56.     Johnston and his associates apparently did not even bother to send Ms. Tanner a copy, complete or incomplete, of the August 28, 2007 trust deed.

## VIII.   Johnston and His Associates Cause Ms. Tanner to Pay Tax on the Lots

57.     Ms. Tanner paid property tax on the "lots" to Washington County for the tax year 2007, and was reimbursed for the tax by Summit.

58.     Thereafter Johnston, Lewis and their associates simply allowed Ms. Tanner to pay the taxes herself, notwithstanding the fact that each of Johnston, Lewis and their associates knew or should have known that Ms. Tanner's ownership interest in the lots was illusory, subject as it was to a $15,000,000.00 undisclosed lien and $9,000,000.00 in additional liens they had duped Ms. Tanner into signing.  So entirely deceived by Johnston, Lewis and their associates was Ms. Tanner that when Washington County sent her tax assessments on the Hurricane "lots" in 2008 and 2009 she dutifully paid the taxes, not knowing and having no reason to suspect her ownership interest in the lots was illusory.

IX.     **Results of Title Search on Ms. Tanner's Hurricane "Lots"**

59.     In August 2010, Ms. Tanner ordered a title search on her two Hurricane "lots."

60.     The title search revealed the existence of the $15 million undisclosed lien on the Hurricane Project and revealed the additional $9 million in liens that Johnston, Lewis and their associates had fraudulently induced Ms. Tanner to place on the property.

61.     It came as a great surprise and shock to Ms. Tanner to learn that Johnston, Lewis and their associates and agents had failed to disclose the $15 million lien at the time of the title transfer or any time thereafter, and to learn she had been duped by Johnston, Lewis and their associates to sign security instruments placing liens of more than $9 million dollars on her "lots," and to learn that far from "increase[ing] the collateral value of the lots," the "subordination to construction financing" Johnston and Lewis had orchestrated actually extinguished any collateral value the "lots" might have had for Ms. Tanner.

**X.**     **Summit/Johnston's Breach of the Promissory Note**

62.     When the Promissory Note reached its maturity date of March 8, 2008, neither Summit nor Johnston repaid Ms. Tanner's principal investment, despite Summit's promise to pay and Johnston's personal guarantee of payment.

63.     At the time he gave his guarantee on the Promissory Note, Johnston knew or should have known that he stood in no position to make good on the guarantee.

64.     For a short time after the maturity date on the Promissory Note, Summit continued to make interest payments on the Promissory Note.  These interest payments then became sporadic.

65.     Summit and Johnston ceased making any payments on the Promissory Note after August 2008.

**XI.**     **Johnston Conceals Financial Problems and Continues to Provide Assurances**

66.     Sometime on or about December 5, 2008, Ms. Tanner received legal documents in the mail, informing her that a construction lien in the amount of almost $1,000,000.00 had been placed on the Hurricane Project.  Alarmed, she called Johnston and after leaving several messages, received a call back in which Johnston told her she didn't have to worry, and that he would take care of it.

67.     Sometime on or about July 1, 2009, Ms. Tanner received a letter from Johnston informing her that "our projects have not gone as well as anticipated" and promising to send "details about my plan for your repayment."

68.     Ms. Tanner requested a meeting with Johnston and on September 2, 2009, Johnston and one of his associates, Brad Jensen, met with Ms. Tanner and her son Timothy

Tanner.  Johnston led off the meeting by saying that because of the downturn in the real estate market, the Hurricane Project had stalled.  He asked Ms. Tanner what she thought she was owed on her investment.   Ms. Tanner replied that she thought she was owed her principal of $600,000.00 plus unpaid interest on the Promissory Note.  Johnston agreed that was what he owed her.

69.     Timothy Tanner asked Johnston if there were other private investors in the Hurricane Project, how much they were owed, and whether there were any pending cases or judgments against him.   Johnston said there were several other investors who were owed millions of dollars, but he refused to provide any specifics.  Johnston then admitted there were currently $4,000,000.00 in outstanding judgments against him and his companies.

70.     Johnston told Ms. Tanner and Timothy Tanner that as far as he (Johnston) was concerned, those who had pursued legal remedies against him were now at the back of the repayment line—they would get their money last, if at all—while those who stuck with Johnston through this difficult time would be paid first.  Johnston asked Ms. Tanner to have patience, to give him a chance to work through his current financial troubles.

71.     Johnston then told Ms. Tanner that he believed in God, that he believed in an afterlife, and because he feared what might happen in the afterlife, he fully intended to pay back Ms. Tanner's investment.  He described how he had said many prayers, asking the Lord for help in keeping his company solvent so that he could repay his creditors.  He said he believed the Lord had heard his prayers and was now blessing him with new business opportunities—other distressed developments in bank foreclosure that Johnston and Summit could take over and bring

to completion, reaping large profits.  Thus, Johnston played on a religious affinity he shared with Ms. Tanner in order to persuade her not to pursue legal remedies.

72.     Johnston then handed over to Ms. Tanner and her son a document on Summit letterhead with the heading "Proposal" and the subject line "Investment Repayment," to which was attached a two-page Proforma with the heading "Project Name: Saratoga Springs – Big House Only" and a map bearing the handwritten legend "Saratoga Springs."

73.     The cover page of the Saratoga Springs Proposal contained three bullet points, the second of which read, "Equity Position in project to pay the balance owed." Johnston explained that he hoped to repay Ms. Tanner's Investment by giving her equity in the Saratoga Springs project.  Johnston did not explain how it would have been possible in September 2009, with $4,000,000.00 in unsatisfied judgments against him and millions more owed to other investors, for him to give Ms. Tanner an equity stake in any new development project without defrauding his other creditors and the other investors in the Saratoga Springs project.

74.     Still trusting Johnston, and relying on Johnston's false representations and omissions at the September 2, 2009 meeting, Ms. Tanner decided not to pursue legal remedies at that time, suffering detriment as other creditors of Summit and Johnston obtained judgments and initiated collection procedures against Summit and Johnston in the succeeding months.

## XII.   The April 12, 2010 Meeting

75.     On April 12, 2010 Ms. Tanner and her son secured another meeting with Johnston.  At that meeting, in response to questioning from Ms. Tanner's son, Johnston revealed that there were now $10,000,000.00 in judgments against him and his companies in connection with the failed Hurricane Project.  Under questioning, Johnston also revealed to Ms. Tanner, for

the first time, that she stood inferior to the banks in her ownership of the "lots," and that she did not hold them free and clear, as she believed.

76.     Ms. Tanner's son asked Johnston how he intended to repay Ms. Tanner's investment.  Johnston said the best, and perhaps only, way was for Ms. Tanner to convert her investment into an equity stake in one of his new projects.

77.     Ms. Tanner's son then asked Johnston how it was possible for Johnston or Summit to secure financing on any new project, given the fact that there were millions of dollars in unsatisfied judgments against Johnston and Summit.  Johnston replied that it was true, no bank would now lend him money, but he was getting around this problem by organizing new companies (one of these he identified by name: Desert Peak Management) to secure financing for new projects.  Johnston further explained that he was taking an equity stake in these new companies and projects through the simple expedient of putting his ownership interest in the name of some close family member—his wife, brother, or son—while having his own name appear only as a salaried employee.

78.     Johnston further told Ms. Tanner that if she agreed to roll her investment over into one of these new companies and projects, she could not only recover her investment but stood to make "quite a bit more" than the 15% he had originally offered on her investment.  Ms. Tanner's son told Johnston that Ms. Tanner was not interested in receiving excess profits, that she was content to simply be repaid her original investment.

## XIII.   The Tolling Agreement

79.     Prior to the filing of this Complaint, Summit, Johnston, Lewis and Ross each signed a Time Defense Tolling and Waiver Agreement with Ms. Tanner.

80.     Pursuant to the Time Defense Tolling and Waiver Agreement, Summit, Johnston, Lewis and Ross agreed, among other things: "Each of the undersigned agree that all Time Defenses [including the defenses of statute of limitations, estoppel, waiver, laches or similar defenses or contentions] applicable to transactions occurring on or after <u>January 1, 2006</u> are tolled and waived with respect to any and all possible causes of action and claims that Claimant [Ms. Tanner] may have against Johnston Group [including Summit, Johnston, Lewis and Ross], or any of them, of any nature whatsoever, and shall be tolled and suspended as of January 1, 2006 and shall not further run until January 7, 2011 (the "Tolling Termination Date"). . . ."

### FIRST CLAIM FOR RELIEF
### Violations of Federal Securities Acts
#### (Against Defendants Summit, Johnston, Lewis and Ross)

81.     Plaintiffs repeat and incorporate all preceding paragraphs of this Complaint by reference, as if set forth verbatim.

82.     The Promissory Note is a security within the meaning of 15 U.S.C. § 77b(a)(1) and 15 U.S.C. § 78c(a)(10).  Other parts of the transactions at issue here may also fall within the definition of security under federal law.

83.     The "1031 Investment Opportunity Memo" is a prospectus within the meaning of 15 U.S.C. § 77b(a)(10).

84.     Defendants Summit, Johnston and Lewis, directly or indirectly, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not

misleading; and (c) engaged in acts, transactions, practices and courses of business that operated as a fraud and deceit upon Ms. Tanner and Tjinta Estates, in connection with the sale of a security.  These acts include, without limitation, the  misrepresentations and omissions described in paragraphs 24-28, 30, 33-37, 39-41, 44, 47, 49, 51, 53-55, 66 and 78 above.

85.     The statements, misrepresentations and omissions described in paragraphs 24-28, 30, 33-37, 39-41, 44, 47, 49, 51, 53-55, 66 and 78 above were false and misleading.

86.     Summit, Johnston and Lewis knew or should have known, or were reckless in not knowing, that the misrepresentations and omissions made to Ms. Tanner in connection with the Promissory Note included material misstatements and omissions.

87.     By reason of the foregoing, Defendants Summit, Johnston, and Lewis have violated Section 10(b) of the Federal Securities Exchange Act, 15 U.S.C.  § 78j(b), and Exchange Act Rule 10b-5, as further defined by Rules 10b5-1 and 10b5-2, 17 C.F.R. §§ 240.10b-5, 10b5-1, 10b5-2.

88.     By reason of the foregoing, Defendants Summit, Johnston and Lewis have also violated Section 17(a) of the Federal Securities Act, 15 U.S.C.  § 77q.

89.     The misrepresentations and omissions of Summit, Johnston and Lewis caused Ms. Tanner and Tjinta Estates to make a $600,000.00 investment in Summit by means of the Promissory Note.  Ms. Tanner and Tjinta Estates would not have made the investment had Summit, Johnston and Lewis truthfully represented all material facts.

90.     No registration statement was in effect as to the security or securities sold to Plaintiffs.  Notwithstanding, Defendants Summit, Johnston and Lewis made use of the means and instrumentalities of interstate commerce, including mail and fax, to sell and to deliver such

security or securities to Ms. Tanner.  By reason of the foregoing, Defendants Summit, Johnston and Lewis offered or sold a security or securities in violation of Section 5(a)(1) and (2) and Section 12(a)(1) of the Federal Securities Act, 15 U.S.C. §§ 77e and 77l.

91.     Defendants Summit, Johnston and Lewis also offered and sold a security by use of the means and instrumentalities of interstate commerce, including mail and fax, by means of a prospectus (the "1031 Investment Opportunity" memo) which included untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading, to Ms. Tanner, who was ignorant of these untruths and omissions. By reason of the foregoing, Defendants Summit, Johnston and Lewis offered or sold a security or securities in violation of Section 12(a)(2) of the Federal Securities Act, 15 U.S.C. § 77l.

92.     Defendant Ross was a principal of Summit at all relevant times surrounding the offer and sale of a security or securities to Ms. Tanner, and was listed as such on Summit promotional materials given to Ms. Tanner in connection with the sale. Upon information and belief Ross was Johnston's principal partner in the Hurricane development, raising millions of dollars in investment for the project from other investors.  In addition, Ross signed, as "Director" for Summit, the three deeds of trust placing an additional $9,000,000.00 in liens on the Hurricane property, including Ms. Tanner's two "lots."

93.     As a Summit principal and "Director" Ross directly or indirectly controlled Lewis, while Lewis, by his own admission, "managed all aspects of Finance and Operations" for Summit.  By reason of the foregoing Ross is liable to Plaintiffs, jointly and severally with and to

the same extent as Lewis, under Section 15 of the Federal Securities Act, 15 U.S.C. § 77o and

Exchange Act Section 20, 15 U.S.C. § 78t(a)

94.     As a direct and proximate result of Summit's, Johnston's, Lewis's and Ross'

violations, Ms. Tanner and Tjinta Estates were damaged in an amount to be proved at trial, but

currently believed to be $600,000.00 in principal, plus interest.

**SECOND CLAIM FOR RELIEF**
**Violations of Utah Securities Act**
(Against Defendants Summit, Johnston and Lewis Ross)

95.     Plaintiffs repeat and incorporate all preceding paragraphs of this Complaint by

reference, as if set forth verbatim.

96.     The Promissory Note is a security within the meaning of Utah Code Ann. § 61-1-

13(1)(ee).

97.     Defendants Summit, Johnston and Lewis, directly or indirectly, in connection

with the purchase and sale of securities, have: (a) employed devices, schemes and artifices to

defraud; (b) made untrue statements of material facts and omitted to state material facts

necessary in order to make the statements made, in light of the circumstances under which they

were made, not misleading; and (c) engaged in acts, transactions, practices and courses of

business which operated as a fraud and deceit upon Ms. Tanner and Tjinta Estates, in connection

with the purchase or sale of a security.    These acts include, without limitation, the

misrepresentations and omissions described in paragraphs 24-28, 30, 33-37, 39-41, 44, 47, 49,

51, 53-55, 66 and 78 above.

98.     The statements, misrepresentations and omissions described in paragraphs 24-28,

30, 33-37, 39-41, 44, 47, 49, 51, 53-55, 66 and 78 above were false and misleading.

26

99.     By reason of the foregoing, Defendants Summit, Johnston and Lewis have violated Utah Code Ann. § 61-1-1.

100.     The misrepresentations and omissions of Summit, Johnston and Lewis caused Ms. Tanner and Tjinta Estates to make a $600,000.00 investment in Summit by means of the Promissory Note.   Ms. Tanner and Tjinta Estates would not have made the investment had Summit, Johnston and Lewis truthfully represented all material facts.

101.     As a direct and proximate result of Summit's, Johnston's and Lewis's violations, Ms. Tanner and Tjinta Estates were damaged in an amount to be proved at trial, but currently believed to be $600,000.00 in principal, plus interest at the statutory rate of 12% per year from the date of Ms. Tanner's and Tjinta Estates' investment pursuant to Utah Code Ann. § 61-1-22.

102.     Summit's, Johnston's and Lewis's violations of Utah Code Ann. § 61-1-1 were reckless and intentional.   In addition to their actual damages plus interest, Ms. Tanner and Tjinta Estates are therefore entitled to recover from each of Summit, Johnston and Lewis three times the consideration Ms. Tanner and Tjinta Estates paid for the Promissory Note (at least $1,800,000.00), together with interest, costs and attorneys' fees, pursuant to Utah Code Ann. 61-1-22.

### THIRD CLAIM FOR RELIEF
**Fraud**
(Against Defendants Summit, Johnston and Lewis)

103.     Plaintiffs repeat and incorporate all preceding paragraphs of this Complaint by reference, as if set forth verbatim.

104.     Summit, Johnston and Lewis made numerous false and misleading representations concerning presently existing material facts to Ms. Tanner.   Those false and misleading

representations included, without limitation, the false and misleading representations described in paragraphs 24-28, 30, 33-37, 39-41, 44, 47, 49, 51, 53-55, 66 and 78 above.

105.    For example, in the Summer of 2006 at a meeting held at the Orem offices of Summit Development & Management, LLC, and in a follow-up memorandum captioned "1031 Investment Opportunity" mailed to Ms. Tanner at her residence in Provo, Utah, Summit, Johnston and Lewis represented to Ms. Tanner that if she invested $600,000.00 with them she would:

   a.    be invested "into a number of lots in the Mira Rosa Subdivision of the Collina Tinta Golf Course Community project in Hurricane, Utah, being developed by Summit Development, with an equal value to your investment";

   b.    be the "owner of said lots and be recorded as such";

   c.    "increas[e] the collateral value of the lots" by "subordinat[ing] to construction financing";

   d.    "receive a guaranteed Fifteen Percent (15%) Annual return on your money over a 12 to 16-month period"; and

   e.    have her investment "guaranteed by Summit Development & Management, LLC and by Heath Johnston (owner) personally."

106.    At the Summer of 2006 meeting, in the "1031 Investment Opportunity" memorandum, and throughout the course of their subsequent dealings, Summit, Johnston and Lewis also represented to Ms. Tanner that her ownership of two "lots" in the Hurricane Project had value as collateral on her $600,000.00 investment with Summit, for the purpose of inducing her to invest in Summit.

107.   In the Summer or Fall of 2006, Summit, Johnston and Lewis also represented to Ms. Tanner that the two "lots" in the Hurricane Project were not encumbered, while concealing the existence of a preexisting lien in the amount of $15,000,000.00 on the Hurricane property, and concealing the fact that the Hurricane property was not approved for subdivision at the time of the investment.

108.   On or about November 29, 2006 and August 17, 2007, Summit, Johnston and Lewis presented Ms. Tanner with certain documents which they represented were ordinary documents necessary to her investment in Summit, and induced her to sign them.   In fact, as Summit, Johnston and Lewis knew or should have known, their representations to Ms. Tanner were false inasmuch as the documents they induced her to sign were deeds of trust placing additional liens of more than $9,000,000.00 on the Hurricane property, including the two "lots" transferred to Ms. Tanner.

109.   These representations, calculated to assure Ms. Tanner that her investment was safe, were false, and Summit, Johnston and Lewis knew the falsity of these representations at the time they were made.

110.   Ms. Tanner and Tjinta Estates did not know these representations made by Summit, Johnston and Lewis were false, relied on the false and misleading representations and omissions in making their investment, paying property taxes on the two "lots," and signing the documents Ms. Tanner was asked to sign, and acted reasonably in doing so.   Ms. Tanner and Tjinta Estates would not have made the investment, signed the documents or paid the taxes but for the false representations, and were injured and damaged as a direct and proximate result,

losing their entire investment of $600,000.00 in the scheme, tax payments and other damages to be proved a trial.

111.    Ms. Tanner is an elderly, vulnerable, unsophisticated investor. The amount she invested and lost in the scheme represented the bulk of her life savings.  Summit's, Johnston's and Lewis's acts were the result of willful and malicious or intentionally fraudulent conduct, and conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of Ms. Tanner and Tjinta Estates.  Ms. Tanner and Tjinta Estates are therefore entitled to an award of punitive damages.

### FOURTH CLAIM FOR RELIEF
### Civil Conspiracy
(Against Defendants Summit, Johnston and Lewis)

112.    Plaintiffs repeat and incorporate all preceding paragraphs of this Complaint by reference, as if set forth verbatim.

113.    Summit, Johnston and Lewis conspired to induce Ms. Tanner and Tjinta Estates to invest in Summit, settling on a course of action that included making false and misleading statements and omissions at a Summer 2006 meeting and in a follow-up seven bullet-point memorandum, and employing various artifices including glossy brochures, pre-made checks, and transfer of paper title to two "lots" in Hurricane, Utah, to deceive Ms. Tanner into believing the investment was safe.  Summit, Johnston and Lewis further conspired to conceal the existence of a preexisting lien in the amount of $15,000,000.00 on the Hurricane property, including Ms. Tanner's two "lots." These actions were in violation of federal and state securities laws, federal mail fraud laws, common law fraud laws, and other laws, and led to the loss of Ms. Tanner's and Tjinta Estates' entire $600,000.00 investment.

114.    Summit, Johnston and Lewis conspired to induce Ms. Tanner and Tjinta Estates to surrender any remaining collateral value their "lots" had by inducing Ms. Tanner to sign, on November 29, 2006 and August 17, 2007, three deeds of trust placing additional liens of more than $9,000,000.00 on the Hurricane property.  These actions were in violation of common law fraud and other various laws, and led to the loss of any remaining value on Ms. Tanner's ownership interest in the two "lots."

115.    Summit, Johnston and Lewis had a meeting of the minds on their desire and plan to get Ms. Tanner's and Tjinta Estates' investment money.

116.    As described above, Summit, Johnston and Lewis engaged in several unlawful, overt acts in furtherance of their conspiracy.

117.    Ms. Tanner and Tjinta Estates suffered damages as a direct and proximate result of the conspiracy in an amount to be proved at trial.

118.    Ms. Tanner is an elderly, vulnerable, unsophisticated investor and Summit's, Johnston's and Lewis's acts were the result of willful and malicious or intentionally fraudulent conduct, and conduct that manifests a knowing and reckless indifference toward, and a disregard of, the rights of Ms. Tanner and Tjinta Estates.  Ms. Tanner and Tjinta Estates are therefore entitled to an award of punitive damages based on the conspiracy.

119.    All participants in the conspiracy, including Summit, Johnston and Lewis, are jointly and severally liable for all damages resulting from the conspiracy.

**FIFTH CLAIM FOR RELIEF**
**Breach of Contract: Promissory Note**
(Against Defendant Summit)

120.    Plaintiffs repeat and incorporate all preceding paragraphs of this Complaint by reference, as if set forth verbatim.

121.    On or about September 8, 2006 Ms. Tanner and Summit entered into the Promissory Note, by which Summit agreed to pay Ms. Tanner "the principal sum of SIX HUNDRED THOUSAND dollars ($600,000.00), together with interest thereon…at a rate equal to FIFTEEN percent (15%) per annum on the unpaid principal amount." The term of the Promissory Note was "between twelve (12) and eighteen (18) months ("Maturity Date")" commencing on the date of the agreement.

122.    The Promissory Note provides that Summit will pay Ms. Tanner "all collection costs, including reasonable attorney fees and legal expenses, in addition to all other sums due hereunder" if the Promissory Note "becomes in default."

123.    The Promissory Note was made and was to be performed in Utah County in the State of Utah, and provides that it is to be "construed and enforced in all respects in accordance with the laws of the State of Utah."

124.    Summit made certain payments to plaintiffs between November, 2006 and August, 2008, totaling some $139,150.00.

125.    When the Promissory Note reached its eighteen month maturity date of March 8, 2008, Summit failed to repay Ms. Tanner the principal sum of $600,000.00, in breach of the terms of the Promissory Note.

126.    As a result of the breach, the principal sum of $600,000.00, plus any unpaid interest on the Note, is now due, owing and unpaid.  Demand has been made on Summit for repayment but defendant Summit has failed and refused, and continues to fail and refuse, to repay the sums due under the Promissory Note.

127.    Plaintiff Ms. Tanner has therefore been damaged as a direct and proximate result of Summit's breach of the Promissory Note in the sum of $600,000.00, plus any unpaid interest due on the Note, plus interest at the legal rate from and after the date due, plus her costs of collection, including attorneys' fees and legal expenses.

## SIXTH CLAIM FOR RELIEF
### Breach of Contract: Repayment Guarantee
(Against Defendant Johnston)

128.    Plaintiffs repeat and incorporate all preceding paragraphs of this Complaint by reference, as if set forth verbatim.

129.    In or around the Summer of 2006, Heath Johnston offered to provide a personal guarantee of repayment as security on a contemplated investment by Ms. Tanner of $600,000.00 into Johnston's company, Summit.  This offer was made orally, at a meeting between Ms. Tanner and Johnston and Lewis at Summit's Orem offices, and in writing, at bullet point six of the "1031 Investment Opportunity Memorandum" Summit sent Ms. Tanner after the meeting.

130.    Ms. Tanner agreed to invest and did invest the $600,000.00 with Summit and Johnston, and Johnston provided the promised repayment guarantee at page two of the Promissory Note: a "Personal Guarantee," signed by Johnston, which states: "With regards to the $600,000 investment being made by Pat Tanner, I individually and personally guarantee the repayment of said investment."

33

131.    As set forth above, Summit breached the Promissory Note when it failed to repay Ms. Tanner the principal sum of $600,000.00 at the maturity date, which sum is now due, owing and unpaid.

132.    Demand has been made on Summit for repayment but Summit has failed and refused, and continues to fail and refuse, to repay the sums due under the Promissory Note. Accordingly, Johnston has become personally liable on his Personal Guarantee to Ms. Tanner for the $600,000.00 principal amount of her investment, plus unpaid interest, attorneys' fees, costs and expenses.

133.    Demand has been made on Johnston for payment of the $600,000.00 under the terms of the Personal Guarantee, but Johnston has failed and refused, and continues to fail and refuse, to pay the sum due under the Personal Guarantee.

134.    Ms. Tanner has therefore been damaged as a direct and proximate result of Johnston's breach of the Personal Guarantee in the sum of $600,000.00, plus interest at the legal rate from and after the date due.  Ms. Tanner is also entitled to recover her attorneys' fees, costs and expenses pursuant to the terms of the Promissory Note and Personal Guarantee of that Note.

**SEVENTH CLAIM FOR RELIEF**
**Breach of Contract: Lease Agreement**
(Against Defendant Summit)

135.    Plaintiffs repeat and incorporate all preceding paragraphs of this Complaint by reference, as if set forth verbatim.

136.    On or about September 22, 2006 Tjinta Estates and Summit entered into a written lease agreement (the "Lease Agreement") "in consideration of the rents, covenants and agreements" set forth therein.  Under the terms of the Lease Agreement, Summit was to "lease"

34

the two "lots" it had transferred to Tjinta Estates for an eighteen-month term commencing on October 1, 2006 and ending March 31, 2008, in exchange for payment of "rent" on the "lots" in the amounts set forth on Exhibit B to the contract.

137.   The "Base Rental Schedule" set forth at Exhibit B to the contract states the monthly rental shall be $5,000.00 per month for the twelve months that comprise year (1) of the Lease Agreement, and $7,500.00 per month for the six months that comprise year (2).  Exhibit B to the Lease Agreement further provides for rent payments of $7,725.00 per month for the twelve months that comprise year (3) and $7.956.75 per month for the twelve months that comprise year (4), and listing "grand totals" of $293,181.00 in rent payments over a period of 42 months.

138.   Lease Agreement Article IV, first paragraph, states that if Summit "fails to pay any Monthly Base Rent when such…is due and payable" then Tjinta Estates, LLC "may assess and collect a late fee charge equal to five percent (5%) of each payment of rent not received within five (5) days from the date such rent payment is due." The second paragraph of Article IV states that "in addition to any late charges payable pursuant to the provisions of this Article, to the extent that any payment of Monthly Base Rent or any other amount payable to Landlord [Tjinta Estates] by Tenant [Summit] pursuant to any provision of this Lease is more than thirty (30) days past due Tenant [Summit] shall pay Landlord [Tjinta Estates] interest at the rate of eighteen percent (18%) per annum on all such past due amounts."

139.   Lease Agreement Article XXI ("Surrender") requires Summit to quit and deliver the leased premises upon the expiration of the Lease, while Section 23.9 ("Holding Over") states that if Summit "remains in possession of all or any part of the Premises after the expiration of the term of this Lease…such tenancy shall be from month to month…and in such case, rent and

other sums due hereunder shall be payable at one hundred fifty percent (150%) of the Monthly Base Rent in effect immediately prior to such holdover period."

140.    Lease Agreement section 18.1 ("Default") states that any "failure by Tenant to pay the Monthly Base Rent" and any "material false statement made by Tenant to Landlord…in any document delivered to Landlord in connection with the negotiation of this Lease" shall constitute a material default and breach of the Lease by Tenant [Summit].

141.    Summit made certain payments to Plaintiffs between November, 2006 and August, 2008, totaling some $139,150.00.

142.    At all times Tjinta Estates has performed its obligations under the Lease Agreement.

143.    Summit has remained in possession of Ms. Tanner's lots beyond the expiration date of the Lease, in a month-to-month tenancy, while failing to pay rent under the terms of the Lease, which event constitutes a material default and breach of the Lease, under Section 18.1.

144.    Summit made material false statements in documents delivered to Tjinta Estates in connection with the negotiation of the Lease, including the false statements set forth in the seven bullet-point memo titled "1031 Investment Opportunity" and the failure to disclose the existence of a $15 million lien on the property in any of the closing documents connected to the transfer of the "lots" from Summit to Tjinta Estates.  This also constitutes a material default and breach of the Lease, under Section 18.1.

145.    Tjinta Estates has been damaged as a direct and proximate result of Summit's breaches of the Lease Agreement in an amount to be determined at trial.

**EIGHTH CLAIM FOR RELIEF**
**Fraudulent Nondisclosure**
(Against Defendants Justin Johnston and ACRES)

146.    Plaintiffs repeat and incorporate all preceding paragraphs of this Complaint by reference, as if set forth verbatim.

147.    On or about September 22, 2006, Summit, Johnston, Lewis and their associates and agents caused Ms. Tanner and Tjinta Estates to enter into two "Real Estate Purchase Contracts" for two "lots" in the Hurricane Project.

148.    Justin Johnston, the brother of Heath Johnston, and ACRES acted as real estate agent and broker in connection with the "sale" of the two "lots" in the Hurricane Project to Ms. Tanner and Tjinta Estates.   The Real Estate Purchase Contracts were prepared on documents with the heading "NAI Utah Commercial Real Estate Services, Worldwide," and the brokerage was identified in the Real Estate Purchase Contracts as "NAI Utah Commercial, Inc."  The Real Estate Purchase Contracts also identified Justin Johnston as the selling agent, and identified "NAI Utah Real Estate" as the selling broker.

149.    Justin Johnston and ACRES knew or should have known that Ms. Tanner and Tjinta Estates were unrepresented on the transaction.

150.    Justin Johnston and ACRES had a legal duty to disclose to Ms. Tanner facts materially affecting the value of the "lots."

151.    Justin Johnston and ACRES knew, or should have known, that the "lots" had not been properly subdivided at the time Ms. Tanner and Tjinta Estates were induced to enter into and close on the the Real Estate Purchase Contracts, and that $15,000,000.00 worth of liens had

been placed on the "lots" prior to the Ms. Tanner and Tjinta Estates entering into and closing on the two Real Estate Purchase Contracts.

152.    These facts materially affected the value of the lots and were unknown to Ms. Tanner.  Justin Johnston and ACRES had a duty to disclose these facts to Ms. Tanner but failed to do so.

153.    Ms. Tanner and Tjinta Estates were damaged as a direct and proximate result of Justin Johnston's and ACRES' fraudulent nondisclosures in an amount to be proved at trial.

**NINTH CLAIM FOR RELIEF**
**Negligence**
(Against Defendants Justin Johnston and ACRES)

154.    Plaintiffs repeat and incorporate all preceding paragraphs of this Complaint by reference, as if set forth verbatim.

155.    This claim is asserted as an alternative to Ms. Tanner's and Tjinta Estates' claim for fraudulent nondisclosure.

156.    Justin Johnston and ACRES owed Ms. Tanner and Tjinta Estates a duty of care in connection with the sale of the two Hurricane Project "lots" to Ms. Tanner and Tjinta Estates. This legal duty included a duty to know and disclose to Ms. Tanner that the two "lots" had not been properly subdivided and that there was $15,000,000.00 worth of liens on the property prior to the time Ms. Tanner and Tjinta Estates entered into, and closed on, the Real Estate Purchase Contracts.

157.    Justin Johnston and ACRES breached their duties of care by failing to become aware of and disclose those facts to Ms. Tanner and by failing to advise her of the consequences of those facts.

158.    Ms. Tanner and Tjinta Estates were damaged as a direct and proximate result of Justin Johnston's and ACRES' negligence in an amount to be proved at trial.

### TENTH CLAIM FOR RELIEF
### Exploitation of Vulnerable Adult
(Against Summit, Johnston and Lewis)

159.    Plaintiffs repeat and incorporate all preceding paragraphs of this Complaint by reference, as if set forth verbatim.

160.    Ms. Tanner is 77 years old.  She is and was a vulnerable adult within the meaning of Utah Code Ann. § 62A-3-301(28).

161.    Summit, Johnston and Lewis held a position of trust and confidence with Ms. Tanner.  Summit, Johnston and Lewis also had a business relationship with Ms. Tanner.

162.    As described above, Summit, Johnston and Lewis knowingly, and by deception, obtained and used Ms. Tanner's funds for their own benefit with the intent to deprive Ms. Tanner of her own use, benefit and possession of those funds.

163.    Summit's, Johnston's and Lewis's acts constitute a violation of Utah Code Ann. § 76-5-111(4)(a).  Ms. Tanner has a private right of action for these violations pursuant to Utah Code Ann. § 62A-3-314.

164.    Ms. Tanner is entitled to recover her costs and attorneys' fees pursuant to Utah Code Ann. § 62A-3-314(3).

### ELEVENTH CLAIM FOR RELIEF
### Vicarious Liability
(Against Summit and ACRES)

165.    Plaintiffs repeat and incorporate all preceding paragraphs of this Complaint by reference, as if set forth verbatim.

166.    At all relevant times and in all relevant respects, Johnston, Lewis and Ross were acting within the scope of their employment and as agents of Summit.  Summit is therefore vicariously liable for all of the damages caused by Johnston, Lewis and Ross.

167.    At all relevant times and in all relevant respects, Justin Johnston was acting within the scope of his employment and as an employee and agent of ACRES.  ACRES is therefore vicariously liable for all of the damages caused by Justin Johnston.

## TWELFTH CLAIM FOR RELIEF
### Alter Ego
(Against Summit, Johnston, Lewis, Ross and Affiliated Entities)

168.    Plaintiffs repeat and incorporate all preceding paragraphs of this Complaint by reference, as if set forth verbatim.

169.    Prior to and after Ms. Tanner's and Tjinta Estates' investment in Summit, Summit was not adequately capitalized to complete the Hurricane Project or the Saratoga Springs Project.

170.    On information and belief, Summit and its affiliated entities failed to observe corporate formalities or maintain formal corporate records, failed to pay regular dividends, routinely distributed funds and assets without regard to corporate formalities, and otherwise failed to observe the normal formalities of corporate or entity existence.

171.    Johnston and Lewis used Summit to promote fraud and injustice against Ms. Tanner and Tjinta Estates.

172.    As a result, the Court should pierce the corporate veil of Summit, find that Summit, Johnston, Lewis and all other affiliated persons and entities as proved at trial are alter egos of one another, and are therefore jointly and severally liable for all damages caused by one another.

40

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Patricia Tanner and Tjinta Estates, LLC pray for the following relief:

A.      For a money judgment in favor of Plaintiffs and against each of the Defendants, jointly and severally, for compensatory damages in an amount to be proved at trial, which amount is expected to exceed $600,000.00.

B.      For a money judgment in favor of Ms. Tanner, and against Summit, Johnston and Lewis, for three times the consideration she paid for the Promissory Note (at least $1,800,000.00), together with interest, costs and attorneys' fees, pursuant to Utah Code Ann. 61-1-22.

C.      For a money judgment in favor of Ms. Tanner and against at least Summit, Johnston and Lewis for punitive damages in an amount to be determined.

D.      For a money judgment in favor of Plaintiffs and against each of the Defendants, jointly and severally, for pre-judgment and post-judgment interest, attorneys' fees, costs and expenses to the maximum amount allowed by any law or contract.

E.      For a judgment determining that Summit, Johnston and other persons or entities to be determined at trial are alter egos of each other and that each is therefore jointly and severally liable for all damages caused by the other.

F.      For a judgment that Summit is vicariously liable for all damages caused by Johnston and Lewis.

G.      For a judgment that ACRES is vicariously liable for all damages caused by Justin Johnston.

41

H.     For any other relief that the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

**SNOW, CHRISTENSEN & MARTINEAU**


_/s/ Keith A. Call_
Keith A. Call
Dennis V. Dahle
*Attorneys for Plaintiffs*

1620598

42