IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| PATRICIA TANNER, an individual; and TJINTA ESTATES, LLC, a Utah limited liability company,<br><br>    Plaintiffs,<br><br><br><br>            vs.<br><br><br><br>HEATH JOHNSTON, an individual; CRAIG LEWIS, an individual; TIMOTHY ROSS, an individual; H & S INVESTMENTS, LLC, a Utah limited liability company d/b/a SUMMIT DEVELOPMENT & MANAGEMENT; JUSTIN JOHNSON, an individual; AMERICAN COMMERCIAL REAL ESTATE SPECIALISTS GROUP, LLC, a Utah limited liability company d/b/a/ NAI UTAH COMMERCIAL REAL ESTATE; UTAH COUNTY COMMERCIAL REAL ESTATE SPECIALISTS GROUP, LLC, a Utah limited liability company; and JOHN DOES 1-10,<br><br>        Defendants. | MEMORANDUM DECISION AND ORDER ON PENDING MOTIONS<br><br><br><br>Case No. 2:11-CV-28 TS |

This matter is before the Court on Defendants American Commercial Real Estate

Specialists Group, LLC d/b/a NAI Utah Commercial Real Estate and Utah County Commercial

Real Estate Specialists Group, LLC's (the "NAI Defendants") Motion for Summary Judgment

and Plaintiffs Patricia Tanner and Tjinta Estates, LLC's Cross Motion for Summary Judgment.

Also before the Court are the NAI Defendants' Motions to Strike and Plaintiffs' Motion for

Leave to Amend Pleadings.  For the reasons provided below, the Court will grant in part and

deny in part the NAI Defendants' Motion for Summary Judgment and Motion to Strike the

Declaration of Patricia Tanner, deny without prejudice Plaintiffs' Motion to Amend Pleadings,

and deny the remaining motions as moot.

## I.  PROCEDURAL HISTORY

Plaintiffs filed their original Complaint in this matter on January 6, 2011.[1]  On May 17,

2011, Plaintiffs filed an Amended Complaint.[2]  Pursuant to their Amended Complaint, Plaintiffs

brought fourteen claims for relief against multiple defendants alleging total damages of $1.8

million.  Plaintiffs' claims were brought against two groups of individuals and entities, the

Johnston Defendants and the NAI Defendants.  The Johnston Defendants consisted of those

defendants directly involved with Heath Johnston and H & S Investments, LLC, d/b/a Summit

Development & Management ("Summit").  Beyond Heath Johnston and Summit, the Johnston

Defendants included Justin Johnston in his personal capacity and other principals of Summit,

Timothy Ross and Craig Lewis.

On January 24, 2012, Heath Johnston and Summit stipulated on behalf of the Johnston

Defendants "that judgment may be entered against them, jointly and severally, in the amount of

---

[1]Docket No. 2.

[2]Docket No. 20.

$940,850.00 (plus interest to accrue at a rate of 2.3% annum from the date of judgment, until paid in full)."[3]  Judgment was subsequently entered against those Defendants on January 26, 2012.  Thus, at this juncture, the only remaining claims are Plaintiffs' claims against the NAI Defendants, premised on the actions of their agents, Lance Thompson and Justin Johnston.

## II.  FACTUAL BACKGROUND

Plaintiff Patricia Tanner is a resident of Utah County.  Over the course of her adult life, Ms. Tanner has invested in real estate.  Ms. Tanner owned real estate in Virginia and Utah, including homes purchased jointly with her husband and several residential properties purchased as a personal investment.

Tjinta Estates is a Utah LLC that Ms. Tanner set up to hold her real estate investments.  Ms. Tanner is the sole owner and operator of Tjinta Estates.

During the 1990s Ms. Tanner began purchasing condos within a complex in Provo, Utah.  Eventually Ms. Tanner acquired five condos within this complex.  The condos were added to Tjinta Estates' holdings.  By 2005, Ms. Tanner owned all five condos free and clear.  Ms. Tanner managed the rental and maintenance of these condos.

At some point, Ms. Tanner and a few other owners within the condo complex decided that they would like to sell their condos.  It was Ms. Tanner's desire to get all of the owners in the complex to sell jointly to increase the purchase price for each unit.  A joint sale would result in a higher purchase price because a sale of fewer than all of the condo units would not result in a transfer of title in the land on which the condos sat.

---

[3]Docket No. 50, at 2.

One of the other condo owners, Anne Fairchild, informed Ms. Tanner and the remaining owners that she had located a prospective buyer through NAI Utah.  The prospective buyer was Summit.  Shortly thereafter, Ms. Tanner met Heath Johnston at a meeting of the condo owners.  Heath Johnson was in attendance at the meeting as a representative of Summit.

During this same time period, Ms. Tanner met Justin Johnston and Lance Thompson.  Both were associate brokers for NAI Utah who were representing Summit in the prospective purchase of the condos.  In January 2006, Ms. Tanner contracted to sell her condo units to Summit for $150,000 per unit, resulting in a total purchase price of $750,000.

After entering into the purchase agreement, Heath Johnston inquired with Ms. Tanner as to her plans for the proceeds from the sale of her condo units.  As a result of this conversation, Ms. Tanner met with Heath Johnston and another officer of Summit, Craig Lewis, at Summit's offices.  Ms. Tanner was made aware of Summit's various developments, including a development in Hurricane, Utah.  In that and subsequent meetings, Heath Johnston outlined the Hurricane development for Ms. Tanner.  Heath Johnston encouraged Ms. Tanner to invest with him and promised her a 15% rate of return on her investment.

During this same time period, Mr. Thompson sent two emails to Ms. Tanner.  The first, sent on July 6, 2006, included Summit marketing materials that set forth the Summit principals' background and experience, and descriptions and pictures of projects that Summit was involved in developing.  The second email, sent on August 14, 2006, attached a document titled "1031 Exchange Opportunity."  That document set out the details of the deal terms described earlier by Heath Johnston.  The body of the email contained the following statement: "Pat, Here is the

proposal, review it and just let me know if this will meet your needs and well [sic] move on to the next step from there."[4]  Both emails were signed "Lance Thompson, NAI Utah."[5]

The "1031 Exchange Opportunity" was drafted on Summit letterhead and included the following "investment summary:"

> In conjunction with the sale and closing of your condo' units, you would invest, via 1031 exchange, between $600,000 and $750,000 into a number of lots in the Mira Rosa Subdivision of the Collina Tinta Golf Course Community project in Hurricane, Utah, being developed by Summit Development, with an equal value to your investment.

> You would be the owner of said lots and be recorded as such.

> You will need to subordinate to construction financing for the improvement of these lots, which only increases the collateral value of the lots.

> You will receive a guaranteed Fifteen Percent (15%) Annual return on your money over a 12 to 16-month period, to be paid out according to your option: monthly checks for some or all of your accrued interest, or roll any unpaid accrued interest into your total investment balance.

> We will accommodate additional 1031 transactions out of this property after 12 to 16 months, if you so choose.

> Your investment will be guaranteed by [Summit] and by Heath Johnston (owner) personally.

> It would be our plan to meet with you at month 11 to discuss what the investment options are and what you would like to do.  In the event that you desire your investment to be returned, Summit would have between the 12 to 16 month period to return your money, allowing us to use our own 1031 money to repay the investment.[6]

---

[4]Docket No. 81 Ex. 4, at 2.

[5]*See id.* Exs. 3, 4.

[6]*Id.* Ex. 4, at 3.

Beyond these two emails, Ms. Tanner does not recall ever discussing her potential investment with either Justin Johnston or Lance Thompson.  Ms. Tanner does recall seeing each at Heath Johnston's office.  However, Ms. Tanner does not recall either being involved in any of the meetings where the Hurricane development investment opportunity was discussed.

Ms. Tanner decided to invest $600,000 with Summit.  In exchange for her investment she received title to two one-fifth acre parcels in Summit's Hurricane development and a promissory note from Summit and Heath Johnston as a personal guarantee of repayment.  On September 8, 2006, Summit and Heath Johnston executed the promissory note agreeing to pay Plaintiffs $600,000 plus 15% annual interest over the course of 12 to 18 months.  The parties closed on the purchase of the Hurricane parcels on September 25, 2006.  Summit agreed to lease back the parcels from Ms. Tanner and provided her the first year's worth of interest payments at the time of closing on the lots.  There is some discrepancy over whether these checks were provided at the closing or mailed to Ms. Tanner shortly after the closing.

On November 29, 2006, and August 17, 2007, at the instigation of Heath Johnston, Plaintiff signed three trust deeds encumbering the Hurricane parcels with a combined total of over $9 million in liens.

Though the purchase documents for the Hurricane parcels were NAI form documents with Justin Johnston's name on the REPC, Justin Johnston disclaimed any involvement in the Hurricane transaction.  Further, NAI Utah is a real estate brokerage, but it is undisputed that it did not receive any compensation for the sale of the Hurricane parcels.  Thus, beyond the two

emails sent by Mr. Thompson, there is no evidence that the NAI Defendants were involved in the Hurricane, Utah transaction.

Eventually Summit stopped making monthly interest payments to Ms. Tanner.  The last monthly payment Ms. Tanner received was in August 2008.  When Summit stopped making payments, Ms. Tanner approached Heath Johnston and he agreed that he owed her money but explained that because of the real estate downturn, he was unable to repay the amount owed.  Instead, Heath Johnston offered to roll her investment into another development that, according to Heath Johnston, would eventually pay out what Ms. Tanner was owed and more.

Over the course of the next two years Ms. Tanner continued to meet with Heath Johnston, but never received further payment or any repayment of her original investment.  Ms. Tanner also ran a title search on her Hurricane parcels and discovered that they were encumbered by other liens and were of very little to no value.  Thus, on January 6, 2011, Ms. Tanner filed the instant suit.

### III.  STANDARD OF REVIEW

Summary judgment is proper if the moving party can demonstrate that there is no genuine dispute as to any material fact and it is entitled to judgment as a matter of law.[7]

> The party seeking summary judgment bears the initial burden of demonstrating an absence of a genuine issue of material fact.  If the moving party does not bear the burden of proof at trial on a dispositive issue, that party may make such a showing

---

[7]Fed. R. Civ. P. 56(a).

simply by indicating to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.[8]

In considering whether a genuine dispute of material fact exists, the Court determines whether a reasonable jury could return a verdict for the nonmoving party in the face of all the evidence presented.[9]  The Court is required to construe all facts and reasonable inferences in the light most favorable to the nonmoving party.[10]

## IV.  DISCUSSION

At issue are Plaintiffs' claims against the NAI Defendants based on the actions of Justin Johnston and Lance Thompson.  Plaintiffs bring the following causes of action against the NAI Defendants: (1) violation of Rule 10b-5 of the Federal Securities Exchange Act;[11] (2) violation of Section 5 of the Federal Securities Act; (3) violation of Section 17(a) of the Federal Securities Act; (4) violations of the Utah Securities Act; (5) fraudulent nondisclosure; (6) negligence; and (7) negligent supervision.

---

[8]*Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 325 (1986)).

[9]*See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Clifton v. Craig*, 924 F.2d 182, 183 (10th Cir. 1991).

[10]*See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Wright v. Sw. Bell Tel. Co.*, 925 F.2d 1288, 1292 (10th Cir. 1991).

[11]In their Motion, the NAI Defendants also move for summary judgment on Plaintiffs' claims under Section 10(b) of the Securities Exchange Act.  "Rule 10b–5 was promulgated by the SEC and 'is coextensive with the coverage of § 10(b).'" *S.E.C. v. Smart*, 678 F.3d 850, 856 (10th Cir. 2012).  For this reason, the Court will consider Plaintiffs' 10(b) and 10b-5 claims jointly.

The NAI Defendants assert that Plaintiffs' claims fail because such claims are barred by the applicable statutes of limitation and because the undisputed facts demonstrate that Plaintiffs cannot satisfy the elements of their claims.  Plaintiffs assert that the undisputed facts demonstrate that they are entitled to summary judgment on their fraudulent nondisclosure claim. The Court will consider the parties' arguments in turn.

A.      EVIDENTIARY ISSUES

As a preliminary matter, the Court will address the parties' objections to two articles of evidence submitted for the first time in briefing on the NAI Defendants' Summary Judgment motion.

1.      PLAINTIFFS' OBJECTION

Plaintiffs object to the Court's consideration of an expert report the NAI Defendants attached as an exhibit to their reply in support of their Motion for Summary Judgment. Plaintiffs' objection is based on the timing and procedure of the disclosure of the expert report and the contents of the report.  Because this Court finds the report irrelevant to its determination of the parties' motions, the Court will deny Plaintiffs' objection as moot.

2.      MS. TANNER'S DECLARATION

The NAI Defendants' move to strike an affidavit submitted by Ms. Tanner on the grounds that the affidavit directly contradicts Ms. Tanner's deposition testimony in an attempt to create a series of sham issues of fact.  Plaintiffs contend that the affidavit meets all the requirements for admissibility and is not inconsistent with Ms. Tanner's prior deposition testimony.

9

"Generally, a court may not disregard an affidavit because it conflicts with prior sworn testimony given by the affiant.  However, if the court believes the affidavit is merely an attempt to create a sham issue of fact, the court may disregard the affidavit."[12]  The Court considers the following factors when determining whether an affidavit is submitted in an attempt to create a sham issue of fact: "whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain."[13]

Here, Ms. Tanner was cross-examined during her earlier deposition testimony and Plaintiffs have not asserted that the affidavit was created based on newly discovered facts. Rather, Plaintiffs argue that any differences in the affidavit and the earlier testimony represent confusion on the part of Ms. Tanner during the earlier deposition testimony that the affidavit attempts to explain.

After reviewing Ms. Tanner's affidavit and comparing it with her earlier deposition testimony, the Court finds that, with one exception, the affidavit is in large part consistent with her earlier testimony and merely attempts to explain earlier statements and cast Plaintiffs in a more sympathetic light.  The exception is testimony added in Ms. Tanner's affidavit to create a sham issue of fact with regard to the level of involvement of Lance Thompson and Justin

---

[12]*Cline v. Chase Manhattan Bank USA*, 2009 WL 236696, at *4 (D. Utah Jan. 30, 2009) (citing *Burns v. Bd. of Cnty. Comm'rs of Jackson Cnty.*, 330 F.3d 1275, 1282 (10th Cir. 2003); *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)).

[13]*Franks*, 796 F.2d at 1237.

Johnston in the negotiation of the sale of Ms. Tanner's investment condos and the decision to invest with Summit.  The Court will address each contradictory statement individually.

In paragraph 14 of her affidavit, Ms. Tanner states that she "spoke with Lance several times in connection with the sale of my condos—he acted as a sort of go-between between Heath and myself."[14]  This statement is contradicted by Ms. Tanner's statement during her deposition that she never met with Mr. Thompson formally and that she did not recall Mr. Thompson negotiating any terms with respect to the purchase of her condos.[15]

Plaintiffs contend that Ms. Tanner stated in her deposition that Mr. Thompson was a go-between for Heath Thompson.  In so arguing, Plaintiffs cite to page 101 of Ms. Tanner's deposition.  That citation, however, does not support Plaintiffs' contention.  At page 100, counsel asked Ms. Tanner whether she remembered discussing the terms of certain documents regarding the Hurricane transaction with Justin Johnston.  Ms. Tanner responded "No.  Usually my communications after the beginning were with Lance."[16]  Ms. Tanner went on to clarify that she did not think she "discussed [the documents] with anybody except that Heath [Johnston] agreed or told me that it would be $300,000 on each one."[17]

This testimony does not support an assertion that Mr. Thompson acted as a go-between between Heath Johnston and Ms. Tanner.  Rather, as illustrated—and in harmony with Justin

---

[14]Docket No. 84 Ex. 1, at 3.

[15]*See* Docket No. 85 Ex. 8, at 12.

[16]*Id*. at 26.

[17]*Id*.

Johnston's testimony—early in the transaction involving Ms. Tanner's investment condos, Mr. Thompson became the point man for Justin Johnston and NAI Utah.

In paragraph 30 of Ms. Tanner's affidavit, Plaintiffs once more attempt to bolster their claims against Mr. Thompson through a statement that contradicts Ms. Tanner's earlier testimony.  In that paragraph Ms. Tanner states, speaking of Mr. Thompson's second email: "The terms all sounded OK to me, so I let Lance know I was ready to move forward on the transaction. I trusted that Lance would provide me with all necessary information going forward because he worked for NAI, which I believed was a reputable real estate brokerage."[18]  In her deposition, Ms. Tanner indicated that she never talked to Mr. Thompson about promissory notes or the property in Hurricane, Utah.[19]  Indeed, the only conversations Ms. Tanner specifically recalled having with Mr. Thompson were just "[f]riendly conversation[s]."[20]

Paragraph 57 of Ms. Tanner's affidavit states that she "never had access to any additional information about Summit or the Hurricane Project beyond the explanation I was given by Heath Johnston, Justin Johnston, Lance Thompson and their associates."  This statement does not clarify any confusion resulting from Ms. Tanner's deposition testimony.  Indeed, Ms. Tanner was very clear in her deposition testimony that she never discussed the Hurricane investment with Justin Johnston or Mr. Thompson.[21]  Mr. Thompson did send Ms. Tanner the two emails

---

[18]Docket No. 84 Ex. 1, at 5.

[19]*See* Docket No. 85 Ex. 8, at 13.

[20]*Id.*

[21]*See* Docket No. 85 Ex. 8, at 11, 14, 16, 19, 20–21, 26, 31, 32, 40, 41.

discussed previously; but, according to Ms. Tanner's deposition testimony, that appears to be the extent of the NAI Defendants' involvement in the Hurricane transaction.

Throughout other portions of the affidavit, Plaintiffs seek to buoy their claims against the NAI Defendants by inserting references to Mr. Thompson and Justin Johnston.  The affidavit also seeks to create a general air of Ms. Tanner's reliance on NAI Utah's name in deciding to invest in the Hurricane parcels that is not present in Ms. Tanner's deposition testimony.  The Court gives these terms no credence to the extent they seek to establish a sham issue of fact as to Justin Johnston and Mr. Thompson's involvement in the Hurricane transaction.

Pursuant to the foregoing analysis, the Court will grant in part and deny in part the NAI Defendant's objection and exclude from its consideration the paragraphs and statements discussed above.

B.      RULE 10b-5

1.      STATUTE OF LIMITATIONS

The statute of limitations applicable to Plaintiffs' claim under Rule 10b-5 is set forth in 28 U.S.C. § 1658.  That provision states as follows:

> (a) Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than four years after the cause of action accrues.
> (b) Notwithstanding subsection (a), a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. § 78c(a)(47)), may be brought not later than the earlier of—
>     (1) 2 years after the discovery of the facts constituting the violation; or
>     (2) 5 years after such violation.

The instant action was commenced within the five-year statute of repose found in §

1658(b)(2).  The alleged fraudulent acts complained of occurred, at the earliest, in August 2006

when Ms. Tanner received Mr. Thompson's second email.  Thus, the statute of repose elapsed no

earlier than August 2011.

Turning then to the two-year statute of limitations found in § 1658(b)(1), the Supreme

Court has stated that "'discovery' refers not only to a plaintiff's actual discovery of certain facts,

but also to the facts that a reasonably diligent plaintiff would have discovered."[22]  "The two-year

period begins to run 'when the circumstances would suggest to an investor of ordinary

intelligence the probability that she has been defrauded.'"[23]  "The purpose behind commencing

the . . . limitations period upon inquiry notice is to discourage investors from adopting a

wait-and-see approach."[24]

The NAI Defendants argue that the statute of limitations began to run no later than

November 2006, because at that time Ms. Tanner was on notice that the Hurricane parcels were

not part of a platted subdivision, and Ms. Tanner signed documents that unambiguously allowed

liens in the amount of $6,850,000 to be recorded against the Hurricane parcels.  Plaintiffs

---

[22]*Merck & Co., Inc. v. Reynolds*, 130 S.Ct. 1784, 1798 (2010).

[23]*Nathel v. Siegal*, 592 F. Supp. 2d 452, 461 (S.D.N.Y. 2008) (quoting *LC Capital Partners, L.P. v. Frontier Ins. Grp.*, 318 F.3d 148, 154 (2d Cir. 2003)).

[24]*Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1202 (10th Cir. 1998) (citing *Tregenza v. Great Am. Commc'ns Co.*, 12 F.3d 717, 722 (7th Cir. 1993) (stating inquiry notice standard discourages tactic of "[h]eads I win, tails you lose"); *Anixter v. Home-Stake Prod. Co.*, 977 F.2d 1549, 1552 (10th Cir. 1992) (stating securities laws are intended "to protect the innocent investor, not one who loses his innocence and then waits to see how his investment turns out before he decides to invoke the provisions of the Act")).

contend that Ms. Tanner did not uncover the fraud until April 2010, and that the statute of

limitations did not commence until that time.

As stated, the issue is not when Ms. Tanner discovered the fraud, but when an investor of

ordinary intelligence would have discovered the probability that she had been defrauded.

However, the Court would note that Ms. Tanner is not an inexperienced investor.  Through her

own efforts, Ms Tanner purchased, maintained, and paid off all five of the investment condos

that were subsequently sold to Summit.  Ms. Tanner currently owns a separate rental property

and owned other such properties in the past.  Ms. Tanner's past experience demonstrates that she

is not unfamiliar with the process of investing in real estate.

Here, Ms. Tanner invested $600,000 with Summit, with the expectation of a 15% return.

According to the investment summary prepared by Summit and relayed by Mr. Thompson, Ms.

Tanner would receive "a number of lots in the Mira Rosa Subdivision of the Collina Tinta Golf

Course Community project in Hurricane, Utah, being developed by Summit Development, with

an equal value to [her] investment."[25]  In actuality, Ms. Tanner received as collateral only two

one-fifth acre parcels, that were of considerably less value than her investment.  Ms. Tanner was

on notice at the time of the sale that the parcels were not properly subdivided lots.[26]  Ms. Tanner

visited the parcels and observed the status of the development on a number of occasions, the first

---

[25]Docket No. 81 Ex. 4, at 3.

[26]*See Salt Lake Cty. v. Metro W. Ready Mix, Inc.*, 89 P.3d 155, 159 (Utah 2004) (holding
that "one who deals with real property is charged with notice of what is shown by the records of
the county recorder of the county in which the property is situated, and by implication charged
with notice of what the records should show but do not").

such visit occurring soon after she closed on the parcels.  In November 2006 and August 2007,

Ms. Tanner signed documents allowing over $9 million in other liens to take priority on the

parcels.[27]  Furthermore, Ms. Tanner stopped receiving payments in August of 2008 and, in

December 2008, she received legal documents in the mail informing her that a construction lien

in the amount of almost $1 million had been placed on the Hurricane Project.  All of these facts

served to put Ms. Tanner on notice that her lots were not of equal value to her investment.

Taking these evidences as a whole, the Court finds that an investor of ordinary

intelligence would have discovered the probability that the value of the parcels was fraudulently

inflated, at the latest, by December 2008.  Accordingly, Plaintiffs' Rule 10b-5 claim is barred by

the two-year statute of limitations.

2.      SUMMARY JUDGMENT

In addition, the Court would note that even if Plaintiffs' Rule 10b-5 claim were timely,

Plaintiffs have failed to put forward evidence sufficient to survive summary judgment on that

claim.

To maintain a claim under Rule 10b-5, Plaintiffs must demonstrate the following

elements: "(1) a misleading statement or omission of a material fact; (2) made in connection with

the purchase or sale of securities; (3) with intent to defraud or recklessness; (4) reliance; and (5)

---

[27]*See ASC Utah, Inc. v. Wolf Mountain Resorts, L.C.*, 245 P.3d 184, 193 (Utah 2010) (holding that "[u]nder Utah law, each party has the burden to read and understand the terms of a contract before he or she affixes his or her signature to it").

16

damages."[28]  In the instant case, Plaintiffs have failed to provide evidence demonstrating

Defendants' intent to defraud or recklessness and damages.

   With regard to intent to defraud or recklessness, Plaintiffs assert that Justin Johnston

made "stunning admissions . . . establishing beyond any reasonable doubt his scienter and

Thompson's."[29]  Plaintiffs appear to imply scienter from statements made by Justin Johnston in

his deposition that he was not of the opinion that any one-fifth acre lot is worth $300,000, that he

did not think investing with Heath Johnston was a good idea for Ms. Tanner, that residential

parcels in Hurricane, Utah were outside of his expertise, and that he knew money was tight for

Summit at the time Plaintiffs invested in Summit.  These statements, when read in context,

merely demonstrate Justin Johnston's personal feelings on the Hurricane development as an

investment and support Justin Johnston's testimony that he was not involved in the Hurricane

transaction and had hoped to obtain Ms. Tanner as a personal client to invest in other transactions

that better fit his area of expertise.[30]  Moreover, the Court has reviewed Justin Johnston's

deposition testimony in its entirety and was unable to find any admission of actual scienter.

   Plaintiffs also cite circumstantial evidence as establishing intent to defraud or

recklessness.  Specifically, Plaintiffs cite: the statement from the investment summary that

Plaintiffs would need to subrogate to construction financing, which only increases the value of

the lots; the high price of the lots; the fact that Heath Johnston and Justin Johnston are brothers;

---

[28]*Grossman v. Novell, Inc.*, 120 F.3d 1112, 1118 (10th Cir. 1997) (citing *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986 (10th Cir. 1992)).

[29]Docket No. 84, at 24.

[30]*See* Docket No. 85 Ex. 7, at 21–22.

(4) statements that Justin Johnston was reckless and unethical; and the fact that Justin Johnston and Mr. Thompson were licensed real estate agents that can be presumed to know where this deal departed from the standard of good faith and fair dealing, and where it descended into outright fraud.

It is not necessarily true that subrogating an interest in land to construction liens does not increase the value of a lot.  In many instances, the act of allowing a lien on property to develop that property does result in an increase of the collateral value of the lot.  Thus, that statement alone does not demonstrate an intent on Mr. Thompson's part to defraud.  It is undisputed that Justin Johnston and Mr. Thompson were not involved in the discussions regarding the price of the Hurricane lots, rather this price was "calculated" by Heath Johnston and "questioned" by Ms. Tanner.[31]  Furthermore, the Court finds the relationship between Heath Johnston and Justin Johnston and other statements regarding Justin Johnston's character or prior drug use irrelevant to the determination of intent to defraud or recklessness in this matter.  Finally, given the scarcity of evidence demonstrating any involvement on the part of Justin Johnston or Mr. Thompson in the Hurricane transaction, the Court finds that neither could be presumed to know when the deal descended into outright fraud.

In short, the Court finds that the evidence cited by Plaintiffs fails to demonstrate either actual evidence of scienter or circumstantial evidence of intent to defraud or recklessness on the part of Justin Johnston or Mr. Thompson.

---

[31]*See id.* Ex. 8, at 25.

As to damages, the NAI Defendants argue that Plaintiffs have failed to prove this element because Heath Johnston and Summit have stipulated to a breach of the promissory note and Plaintiffs are barred from recovering in fraud what are essentially contract damages.  Plaintiffs contend that their prior contractual recovery does not bar a recovery for their securities claims and further assert that they are entitled to statutory damages of $1,800,000 under Utah Code Ann. § 61-1-22.

> Although neither Section 10(b) . . . nor Rule 10b–5 contains explicit provisions for determining damages, courts have applied the "actual damages" standard of Section 28 of the Securities Exchange Act of 1934 . . . to Rule 10b–5 claims.  Under Section 28 of the Act, the "correct measure of damages . . . is the difference between the fair value of all that the (plaintiff) received and the fair value of what he would have received had there been no fraudulent conduct."[32]

"The law on damages generally does not require a plaintiff to establish 'the quantum of damages with mathematical precision,' but there must be sufficient evidence introduced by the plaintiff to provide a trier of facts with an intelligent means in determining an appropriate damages award without speculation or conjecture."[33]

Plaintiffs' original investment was for $600,000.  Plaintiffs' expectation was to receive the original $600,000 plus an additional 15% return on investment.  Had there been no fraudulent conduct, this is what Plaintiffs would have received.  Therefore, that amount, minus any payments made, is the actual damage Plaintiffs have suffered.  It appears that this same amount is

---

[32]*Feldman v. Pioneer Petroleum, Inc.*, 813 F.2d 296, 301 (10th Cir. 1987) (quoting *Randall v. Loftsgaarden*, 478 U.S. 647, 661–62 (1986)).

[33]*Id.* at 301–02 (quoting *King & King Enters. v. Champlin Petroleum Co.*, 657 F.2d 1147, 1158 (10th Cir. 1981)).

what Heath Johnston and Summit agreed to repay in the stipulation and judgment.  Plaintiffs have not come forward with any evidence of damages in excess of what they are due under the stipulated settlement with the Johnston Defendants.

A settlement by Heath Johnston and Summit can only be viewed as a recovery for the same damages Plaintiffs claim under Rule 10b-5.  Thus, the Court must consider that settlement and recovery in computing actual damages.[34]  Because the Court considers only actual damages, Plaintiffs' theory of state-law statutory damages of $1,800,000 is irrelevant to the determination of damages under Rule 10b-5 and does nothing to change this outcome.

Because Plaintiffs have not demonstrated that they have suffered any actual damages for which they have not been compensated by the Johnston Defendants, the Court finds that Plaintiffs have failed to meet their burden as to this element.

In sum, the Court finds as a matter of law that Plaintiffs have failed to produce evidence sufficient to establish the elements necessary to maintain their Rule 10b-5 claim.

---

[34]*See Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 781–84 (3d Cir. 1976) (holding that under Securities Exchange Act provision limiting recovery under Act to actual damages, settlement payment made to certain defendants, obviously in discharge of their obligation to plaintiffs, was to be considered as recovery, and whole picture was to be considered in computing damages); *Simon v. New Haven Bd. & Carton Co., Inc.*, 516 F.2d 303, 306 (2d Cir. 1975) (holding that "[t]o impose harsh penalties on one who might commit a mere technical violation of the securities laws (even if there were evidence of such a violation here, which there [is] not) to benefit one who has not been injured would not only be unjust, but would contravene Section 28 of the Securities Exchange Act of 1934").

C.      FEDERAL SECURITIES ACT

1.      STATUTE OF LIMITATIONS

Plaintiffs' claims under Sections 5 and 17(a) of the Federal Securities Act are subject to the statute of limitations set out in 15 U.S.C. § 77m.  Plaintiffs have conceded that, "without equitable tolling, [their] claims under the [Federal Securities] Act would be time barred."[35] Based on this concession and the undisputed facts of this case, the Court finds that Plaintiffs' Federal Securities Act claims are barred by the applicable statute of limitations.

2.      EQUITABLE TOLLING

While recognizing that statutory rules govern their federal claims, Plaintiffs argue briefly that the statue of limitations should nevertheless be tolled.  Other courts have held that the statute of limitations found in 15 U.S.C. § 77m is an absolute bar and cannot be tolled.[36]  Indeed, the United States Supreme Court has held that "the equitable tolling doctrine is fundamentally inconsistent with the 1-and-3-year" statutes of limitation, such as that in § 77m.[37]  In a separate case, the Court reasoned that where "Congress explicitly puts a limit upon the time for enforcing a right which it created, there is an end of the matter.  The Congressional statute of limitation is definitive."[38]

---

[35]Docket No. 84, at 40.

[36]*See Gardner v. Investors Diversified Capital Inc.*, 805 F. Supp. 874, 878 (D. Colo. 1992); *Hardy v. First Am. Bank, N.A.*, 774 F. Supp. 1078 (M.D. Tenn. 1991)).

[37]*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991).

[38]*Holmberg v. Armbrecht*, 327 U.S. 392, 395 (1946).

Nevertheless, this Court has held that "[t]he doctrine of equitable tolling . . . is 'read into every federal statute of limitations.'"[39] "The doctrine 'is grounded in the fraudulent concealment of the harm which gives rise to the right to sue,' and provides that the limitations period does not begin to run 'until the fraud is or should have been discovered.'"[40]

Plaintiffs argue that "[t]here was active concealment here . . . [i]nasmuch as the Johnston brothers and Thompson worked in concert to defraud Mrs. Tanner, the lulling conduct of Heath Johnston (which protected all three) should be attributed to all three."[41] The Court is not convinced. Plaintiffs have provided the Court with no evidence demonstrating concealment activities taken by either Justin Johnston or Mr. Thompson. Plaintiffs' conclusory allegations are insufficient to warrant equitable tolling of the statute of limitations in this case.

Therefore, even assuming that the doctrine of equitable tolling applies to Plaintiffs' federal claims, the Court finds that Plaintiff has failed to put forward evidence demonstrating that such equitable relief is merited in this case.

3.    SUMMARY JUDGMENT

Beyond being untimely, Plaintiffs' Federal Securities Act claims fail as a matter of law. Plaintiffs' Securities Act claims are premised on the actions of Mr. Thompson, specifically his second email with the attached investment summary drafted by Summit.

---

[39]*Dahl v. Gardner*, 583 F. Supp. 1262, 1264 (D. Utah 1984) (quoting *Holmberg*, 327 U.S. at 395); *see also Sterlin*, 154 F.3d at 1195–96.

[40]*Dahl*, 583 F. Supp. at 1264 (quoting *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1043 n.7 (10th Cir. 1980); *Vanderboom v. Sexton*, 422 F.2d 1233, 1240 (8th Cir. 1970), *cert. den.*, 400 U.S. 852 (1970)).

[41]Docket No. 84, at 43.

"The Securities Act primarily regulates one corporate event: the initial distribution of securities.  The Act requires issuing companies to make a number of company and transaction-specific disclosures and to deliver this information to potential investors."[42]

> Section 12(2) provides, in pertinent part, that any person who offers or sells a security by use of the mails or interstate facilities by means of a prospectus or oral communication which includes any untrue statement or omission of a material fact is liable for damages to the immediate purchaser of the security.  The Supreme Court has "indicated in dicta that only purchasers in the initial public offering could bring suit pursuant to section 12(2)."[43]

Because Plaintiffs present no evidence that the security issued here, the promissory note, was part of a public offering, their argument regarding fraudulent misrepresentation is irrelevant.[44]

This holding is supported by a review of the supposed "prospectus" at issue.  Plaintiffs assert that the investment summary attached to Mr. Thompson's second email is a prospectus for purposes of § 12(2).  In *Gustafson v. Alloyd Co., Inc.*, the Court rejected a similarly situated plaintiff's attempt to define the term "prospectus" to include a contract between the parties.  In so doing, the Court reasoned that "whatever else 'prospectus' may mean, the term is confined to a

---

[42]*Sheldon v. Vermonty*, 246 F.3d 682, at *3 (10th Cir. 2000) (unpublished) (citing *Gustafson v. Alloyd Co.*, 513 U.S. 561, 570–72 (1995)).

[43]*Id.* at *3 (quoting *Joseph v. Wiles*, 223 F.3d 1155, 1160–61 (10th Cir. 2000)).

[44]*See Perry v. Robinson*, 99 F.3d 1150 (10th Cir. 1996) (unpublished) (holding that where plaintiffs "present[ed] no evidence that the securities . . . were part of a public offering, their argument regarding fraudulent concealment is irrelevant").

document that, absent an overriding exemption, must include the 'information contained in the registration statement.'"[45]

Here, Plaintiffs offer no more than the bare legal conclusion that the investment summary is "a written prospectus within the meaning of 15 U.S.C. § 77b(a)(10)."[46]  Plaintiffs have not established that the investment summary "must" contain the information required in a registration statement or even that it contains such information.  Plaintiffs' legal conclusion, without more, is insufficient to maintain a claim under § 12 of the Securities Act.

Because Plaintiffs have failed to establish that the investment summary was a prospectus issued pursuant to a public offering, the Court need not reach the issue of whether Mr. Thompson solicited Ms. Tanner to invest with Summit and was motivated in so doing by a desire to financially benefit himself or Heath Johnston and Summit.

D.      STATE-LAW CLAIMS

The Court has subject matter jurisdiction in this case pursuant to 28 U.S.C. § 1331 because one or more of Plaintiffs' claims arise under the law of the United States.[47]  The Court's subject matter jurisdiction over Plaintiffs' state-law claims is derived from 28 U.S.C. § 1367,

---

[45]*Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 569 (1995).

[46]Docket No. 84, at 21 (citing allegation of Plaintiffs' Amended Complaint, Docket No. 20, at 24).

[47]*See* Docket No. 2, at 5; 28 U.S.C. § 1331 (providing that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States").

based on Plaintiffs' allegation that "those claims are so related to the federal claim[s] in this action that they form part of the same case or controversy."[48]

While 28 U.S.C. § 1367(a) provides this Court "supplemental jurisdiction over all other claims that are so related to claims in the action within [the Court's] original jurisdiction," this "pendent jurisdiction over state claims 'is exercised on a discretionary basis.'"[49]  The Tenth Circuit has made clear that "if federal claims are dismissed before trial, leaving only issues of state law, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."[50]

In light of this precedent and the foregoing finding that Plaintiffs' federal securities claims are barred by the applicable statute of limitations and fail as a matter of law, the Court will dismiss without prejudice Plaintiffs' remaining state-law claims.[51]

E.     PLAINTIFFS' CROSS MOTION

Plaintiffs' Cross Motion for Summary Judgment is limited to their state-law fraudulent nondisclosure claim.  Because the Court will dismiss that claim without prejudice, Plaintiffs' Motion is moot.  Additionally, the NAI Defendants moved to strike Plaintiffs' Motion for

---

[48]Docket No. 2, at 5.

[49]*Brooks v. Gaenzle*, 614 F.3d 1213, 1229 (10th Cir. 2010) (quoting *Bauchman v. W. High Sch.*, 132 F.3d 542, 549 (10th Cir. 1997)).

[50]*Id.* (internal quotation marks and citations omitted).

[51]*See id.* (reversing district court's grant of summary judgment on state-law claims and remanding to dismiss such claims without prejudice).

Summary Judgment as untimely.  Because Plaintiffs' Cross Motion is moot, it follows that

Defendants' Motion to Strike is also moot.

F.      MOTION TO AMEND

Plaintiffs seek leave to amend their Amended Complaint to clarify that they are seeking

treble damages under Utah law.  Because the Court will decline to exercise supplemental

jurisdiction over Plaintiffs' state-law claims, it will deny Plaintiffs' Motion to Amend without

prejudice to Plaintiffs bringing such claims in a Utah state court of appropriate jurisdiction.

## IV.  CONCLUSION

Based on the foregoing, it is hereby

ORDERED that the NAI Defendants' Motion for Summary Judgment (Docket No. 81) is

GRANTED IN PART AND DENIED IN PART.  Pursuant to the terms of this Order, Plaintiffs'

state-law claims will be dismissed without prejudice to Plaintiffs bringing them in a Utah state

court of appropriate jurisdiction.  It is further

ORDERED that Plaintiffs' Cross Motion for Summary Judgment (Docket No. 85) and

the NAI Defendants' Motion to Strike Plaintiffs' Untimely Motion for Summary Judgment

(Docket No. 96) are DENIED AS MOOT.  It is further

ORDERED that the NAI Defendants' Motion to Strike the Declaration of Patricia Tanner

(Docket No. 88) is GRANTED IN PART AND DENIED IN PART, pursuant to the terms of this

Order.  It is further

ORDERED that Plaintiffs' Motion for Leave to Amend Pleadings (Docket No. 86) is

DENIED WITHOUT PREJUDICE.  The Clerk of Court is instructed to enter judgment in favor

of the NAI Defendants and against Plaintiffs on Plaintiffs' federal securities claims, to dismiss

Plaintiffs' state-law claims without prejudice, and to close this case in accordance with this Order

and the Court's prior judgment.

       DATED   July 17, 2013.

                        BY THE COURT:

                        _____

                        TED STEWART
                        United States District Judge